UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PAMELA S. HANSON,

    Plaintiff,

    v.

CATERPILLAR, INC.,

    Defendant.

No. 09 CV 4809
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

Plaintiff Pamela S. Hanson ("Hanson" or "Plaintiff") worked for Defendant Caterpillar, Inc. ("Caterpillar" or "Defendant") from October 11, 2004 until she was terminated on or about February 10, 2005. Hanson claims that Caterpillar violated the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101 *et seq.*, when it terminated her. Defendant has moved for summary judgment. I grant Defendant's motion on the grounds that Hanson is not a "qualified individual with a disability" under the ADA.

## I. BACKGROUND

Caterpillar hired Pamela Hanson as a supplemental employee on October 11, 2004. Hanson was employed as an assembler at Caterpillar's Aurora, Illinois manufacturing facility. At all times during her employment, she was a member of the United Automobile Aerospace and Agricultural Implement Workers of America, Local Union 145. As such, a collective bargaining agreement between the Union and Caterpillar governed her position as a supplemental employee.

Hanson worked on the assembly line for the 980 tractor. The 980 assembly line was one of several lines in the mile-long manufacturing facility in Aurora. To get to her position on the line, Hanson needed to rotate her head in order to look for forklifts and other equipment in the

facility.  Once at her work station, Hanson's tasks were as follows: she was responsible for attaching the steering shaft, hydraulic hoses, toolbox, and side panels to the 980's cab. Additionally, she "torqued down" the cab, or secured it to the main body of the tractor. Accomplishing these tasks required various combinations of climbing the large vehicle, carrying parts and tools weighing from five to fifteen pounds, crawling into tight spaces, and twisting and turning her neck.

On or about October 25, 2004, Hanson injured her neck while attaching the hydraulic hoses to the cab.  While pulling on a torque wrench, Hanson heard a "pop" in her neck.  Despite the injury, Hanson continued working the shift.  She did not seek medical attention or report the injury on the day she was injured.

Over one month later, on December 3, 2004, Hanson reported her injury.[1]  On that same date, Hanson saw a physician in Caterpillar's medical department, Dr. William Roggenkamp. Hanson described the October incident and explained that she had been having neck pain in the five to six weeks since it occurred.  Dr. Roggenkamp performed an examination and ordered x-rays.  The x-rays showed "marked spurring" between Hanson's fourth and fifth cervical vertebrae, along with arthritis in the front of her neck.  Dr. Roggenkamp concluded that the condition was not actually caused by the October incident, but was a degenerative condition.

Based on his diagnosis, Dr. Roggenkamp recommended that Hanson wear a soft neck collar and take over-the-counter anti-inflammatory medications.  Additionally, he attached the

---

[1] Defendant cites that date as the date when she reported the injury "to Caterpillar." Plaintiff disputes this characterization.  She states that she only reported the injury to her Union Hall, representatives of which allegedly told her to wait to report the injury at the risk of being terminated.

2

following medical restrictions on Ms. Hanson: 1) no lifting over ten pounds, 2) no pushing or pulling over ten pounds with either of her arms, 3) no rotating or bending of the neck, and 4) no overhead work. Hanson insisted that she did not need the medical restrictions.

Dr. Roggenkamp notified Hanson's direct supervisor, Alan Kitterman, of the restrictions. Also informed was the "Move Coordinator," Dee Sheffer. Sheffer's job was to match medically restricted employees to jobs that fit within their restrictions, with additional considerations for job qualification and seniority.[2]

Based on her restrictions, Kitterman determined that Hanson could not work in her regular assembly job. Plaintiff disputed the determination and still disputes it. Regardless, she was moved to "the cage," an office area on the shop floor. There, Hanson did light duty - basically filing and other paperwork tasks - on what was understood to be a temporary basis. In "the cage," Hanson reported to Junior Smith.

On December 6, 2004, Hanson returned to Dr. Roggenkamp for her prescribed follow-up appointment. At the appointment, Hanson reported less pain and Roggenkamp noted increased range of motion. Roggenkamp prescribed onsite physical therapy.

The following day, December 7, 2004, Hanson again came in to see Dr. Roggenkamp. At this appointment, Hanson indicated that her pain had not improved and that she could not bend her neck down to read. Roggenkamp concluded that Hanson had "acute cervical syndrome with

---

[2]In Plaintiff's Local Rule 56.1(b) statement addressing Defendant's purported undisputed facts, Plaintiff denies this fact. However, because she offers no explanation or citation to the record to support the denial, I deem it admitted. *See* N.D. Ill. Civ. R. 56.1(b)(3)(B)(responses to movant's statement of facts "shall contain...a response to each numbered paragraph in the moving party's statement, including, *in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon*..." (emphasis added)).

3

significant calcification." He then referred Hanson to an outside spine specialist, Dr. Thomas McGivney at Castle Orthopedics.

Plaintiff saw Dr. McGivney on December 9th, and based on her description of her pain and restricted movement, McGivney ordered four weeks of physical therapy, two to three times per week. He also ordered the following medical restrictions: 1) no lifting over twenty pounds, 2) no pushing or pulling with both arms, and 3) no overhead work. Again, Plaintiff disputed the need for any restrictions.

Plaintiff returned to see Dr. Roggenkamp on December 13th and reported on her visit to Dr. McGivney. Plaintiff reported that her neck was feeling better, but Roggenkamp kept his restrictions in place. Roggenkamp's restrictions were slightly more strict than McGivney's. Plaintiff continued to dispute the need for any such restrictions.

On December 21, 2004, Plaintiff again returned to see Dr. Roggenkamp. This time, she reported a resurgence of pain in her neck, particularly when working with blueprints (which required her to scan downward with her neck). At this point, Dr. Roggenkamp determined that Hanson had significant neck arthritis. He also began to consider longer-term restrictions and to have concerns about Hanson's ability to perform regular assembly work in the long term.

Plaintiff returned to Roggenkamp on January 3rd, 2005. This time, Plaintiff's pain had improved. Roggenkamp noted that Plaintiff was doing "significantly better." Her pain was limited to the left side and only when bent. She had full rotation but some limitations in bending her neck laterally. Roggenkamp now thought the injury may be a cervical strain that was improving. He decided to keep his original restrictions in place until Hanson could again see the outside consultant, Dr. McGivney.

The following day, January 4th, Plaintiff saw McGivney. McGivney modified his restrictions as follows: 1) no lifting over 20 pounds, 2) no work at or above shoulder level, 3) no overhead work, and 4) no reaching or forceful pushing or pulling with both arms.

After consulting with Dr. McGivney, Dr. Roggenkamp saw Plaintiff on January 7, 2005. McGivney had told Roggenkamp that if Plaintiff were to continue physical work in the long term, she would need to be under some medical restrictions in doing so.[3]

On or about that same day, January 7th, 2005, Hanson received her first performance evaluation from her original supervisor on the assembly line, Alan Kitterman. Kitterman rated Hanson "below average" in the areas of work quantity produced, initiative, cooperation, and self discipline. Kitterman indicated that he did not believe that Hanson had any physical limitations.[4]

Shortly after that, on or about January 12th, 2005, Dr. Roggenkamp modified his work restrictions. The new restrictions were: 1) no lifiting over 20 pounds; 2) no pushing or pulling over 20 pounds; 3) no bending or rotating her neck more than 30 degrees; and 4) no overhead activity.

Roughly one week later, on or about January 19th, 2005, Hanson was transferred from "the cage" to a position as a sub-assembler. In this capacity, Hanson put bolts in washers and put screws inside of caps. This was an off-the-line position, but Hanson reported to her same

---

[3]Plaintiff objects to McGivney's statements as inadmissible hearsay. This is true if offered for the truth of their content, but here they appear to be offered for their effect on Roggenkamp and his subsequent actions. As such, they are allowed.

[4]According to Plaintiff, Kitterman also told Hanson in that meeting that women like her "shouldn't be on the line" and that Hanson "should be in a job that women perform." These comments are, of course, reprehensible. But this is a case alleging disability discrimination, not sex discrimination. For reasons unknown to the court, this case was not pursued as a gender discrimination matter. As such, the apparently sexist statements are simply irrelevant.

5

supervisor from her original on-the-line position, Allen Kitterman. It is disputed whether or not this position was permanent.

On or about January 20th, Plaintiff again saw Dr. Roggenkamp. At this appointment, Roggenkamp added a forty-hour work week restriction to Hanson's existing restrictions. Four days later, Hanson again reported to Roggenkamp and related that she had continued neck pain. Roggenkamp continued the restrictions and physical therapy.

At some point after the January 24th appointment, Plaintiff was transferred to a position on the 980 tractor manufacturing line. The position was not the original one for which Plaintiff had been hired, but one in which Plaintiff attached hydraulic hoses from ground level. She could do this job pain free. As with the sub-assembly position, it is disputed whether the position was available on a permanent basis.

On February 7th, 2005, Plaintiff again saw Dr. Roggenkamp. Roggenkamp noted that Hanson's condition had improved but that she had difficulty nodding her head. At this point, Roggenkamp determined that Hanson would most likely be unable to return to a regular assembly position. He based his opinion on the fact that Hanson had been symptomatic for four months and was "short and slight in stature." Dr. Roggenkamp advised Hanson that her injury was no longer being deemed work-related and that therefore her physical therapy at Caterpillar would end. He advised her to seek further treatment at Rezin Orthopedics.

On the same day, Roggenkamp sent an email to "advise the factory" that in his opinion Hanson's condition had "plateaued" and that, therefore, her "restrictions will remain long term."

On or about that same day, February 7th, 2005, Doug Howell, a Labor Relations Representative for Caterpillar's Medium Loader Assembly Group, made the determination to

6

terminate Hanson based on her medical restrictions. Howell determined that Hanson could not fulfill the duties for which she had been hired and that there were no other appropriate, permanent positions. Hanson admits that Howell made these determinations but disputes them on the merits.

At 2:38 p.m. Howell sent an email to Plaintiff's supervisor, Kitterman, advising him of his decision. He stated that "Ms. Pamela Hanson has reached her maximum medical condition. Therefore, she will need to be let go, because she is unable to perform the work for which she was hired." Howell directed Kitterman to use specific "verbiage" in letting Hanson go, as follows:

> Ms. Hanson, we are separating you effective today because your medical restrictions will not allow you to perform the work for which you were hired. Your history folder will reflect that you are recommended for rehire. You will be placed back into the employment pool and will be considered for employment at a future date if your medical restrictions allow.

Three days later, on February 10, 2005, Kitterman informed Hanson of Howell's determination to terminate her. Though deemed eligible for rehire, Caterpillar never rehired her, citing her medical restrictions.

On February 23, 2005 and April 20, 2005 two physicians, Dr. Draxinger and Dr. Ghanayem, respectively, determined that the restrictions were unnecessary. The former physician was employed at Rezin Orthopedics, the clinic Dr. Roggenkamp had recommended to Hanson.

## II. STANDARD OF REVIEW

Summary judgment is appropriate under Rule 56 when the movant's briefs and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter

7

of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). Once a moving party has met its burden, the non-moving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Becker v. Tenenbaum-Hill Assoc., Inc.,* 914 F.2d 107, 110 (7th Cir. 1990). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. *Fisher v. Transco Services-Milwaukee, Inc.,* 979 F.2d 1239, 1242 (7th Cir. 1992).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Stewart v. McGinnis,* 5 F.3d 1031, 1033 (7th Cir. 1993). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252.

### III. DISCUSSION

The Americans with Disabilities Act was enacted to combat, among other things, employment discrimination against individuals with disabilities. Americans with Disabilities Act, Pub. L. No. 101-336, §2, 104 Stat. 328 (1990).[5] Under the pre-amendment ADA, the Act covered a person if the person was a "qualified individual with a disability." 42 U.S.C.

---

[5]The ADA was amended effective January 1, 2009. *See* ADA Amendments Act, Pub. L. No. 110-325, § 8, 122 Stat. 3559 (2008). The pre-amendment version of the ADA, therefore, governs this action. *See Fredrickson v. UPS, Inc.*, 581 F.3d 516, 521 n.1 (7th Cir. 2009) (discussing retroactivity of ADA).

§12111(8). "Disability" was, in turn, defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *Id.* at §12102(1). Plaintiff here proceeds solely under the "regarded as" theory of disability.

Caterpillar did not regard Hanson as disabled. She, therefore, cannot recover on her claims of disability discrimination. In order to be a "qualified individual with a disability" under the "regarded as" theory, Plaintiff must prove that Caterpillar knew of her condition and believed that the condition substantially limited her in a major life activity, namely the life activity of working. *Fredrickson v. UPS, Inc.*, 581 F.3d 516, 523 (7th Cir. 2008). To meet this standard, Plaintiff must have evidence that the company believed she was significantly restricted in the ability to perform a broad range of jobs. *Id.*; *see also Kotwica v. Rose Packing Co.*, 637 F.3d 744, 749 (7th Cir. 2011) (A plaintiff proceeding under the "regarded as" theory "need[s] to produce objective evidence establishing that [a defendant corporation] considered her restrictions to disqualify her from a broad class of jobs.")

In this case, it is beyond dispute that Caterpillar knew of Hanson's neck condition. It is also inarguable that Caterpillar thought (mistakenly or otherwise) that Plaintiff could not perform the job for which she was hired, namely that of a regular assembler on the 980 tractor. Therefore, the sole remaining question in the "regarded as" analysis is as follows: "[H]ow broadly did the employer, subjectively, view the person's impairment?" *Miller v. Ill. Dep't of Trans.*, 643 F.3d 190, 196 (7th Cir. 2011).

The question is "one of proof," and the Seventh Circuit has emphasized that when considering subjective intentions in this context, a mix of quantitative evidence and inference

9

from circumstantial evidence may be employed. *Id.* at 196-97. Here, all of the relevant evidence points to the conclusion that Caterpillar regarded Hanson as only limited in relatively narrow ways. After she revealed her injury and up until Hanson was terminated, she worked in a variety of capacities in the Aurora factory. Hanson did filing and other clerical work in the cage. She was placed in a "sub-assembly" position, an off-the-line position which involved assembling smaller fixtures that would then proceed to the line itself. Finally, Defendant allowed Plaintiff to conduct on-the-line work installing hydraulic lines on the 980 tractor. By Plaintiff's own description, "[i]nstalling hydraulic lines was up the assembly line a couple of stations, and it was on the same line...but was just a different cell on the assembly line." The undisputed facts show that Caterpillar viewed Hanson as being unable to perform only a relatively small field of jobs, i.e. a select subset of assembly stations on one manufacturing line at one plant.

There is no contrary, relevant evidence tending to show that Defendant subjectively thought of Plaintiff as excluded from a "broad class of jobs" or that they took such a "dire view of her employment prospects" as to consider her disabled. *Kotwica*, 637 F.3d at 749. The two pieces of evidence Plaintiff relies on in urging a "regarded as" determination are irrelevant. Plaintiff first points to her own deposition in which she claims that Dr. Roggenkamp told her that she "would not be able to perform any jobs," including "any computer job, [or] any job that has anything looking up or down." The problem with this statement is that it was not made by a relevant decision maker, such as the Labor Relations Representative, Douglas Howell, Plaintiff's supervisor, Allen Kitterman, or even the Move Coordinator, Dee Sheffer. Indeed, the actions of those personnel indicate that Defendant itself did not adopt Dr. Roggenkamp's sweeping view - Hanson was placed in clerical, sub-assembly, and select assembly positions.

The second piece of evidence also may not be considered. Plaintiff points to an email sent by Floyd Braddy, an Environmental Health and Safety Associate at Caterpillar. Braddy had been charged with investigating whether, given Plaintiff's medical conditions, she could operate a parflange machine. Braddy determined that Plaintiff could not operate the machine. He also took his determination "a step further" by stating that "with [Hanson's] assigned medical restrictions I would be hard pressed to find her capable of doing about any job in the shop."

The problem with this statement is that the email was sent on March 21, 2005 - almost two months after Defendant terminated Plaintiff - and in the context of Plaintiff's attempt to be re-hired. Therefore, it is wholly outside of the scope of the allegations here, which relate to Defendant's alleged discriminatory discharge and failure to accommodate. Just as "post-termination actions do not constitute evidence supporting an inference that [an employer's] stated reasons [for termination] were false," *Bilow v. Much, Shelist, Freed, Denenberg, Ament & Rubenstein, P.C.*, 96 F. Supp. 2d 763, 772 (N.D. Ill. 2000), they cannot support a *post hoc* inference that Defendant regarded Plaintiff as disabled.

## IV. CONCLUSION

Plaintiff is not a "qualified individual with disability." Therefore, she cannot recover for alleged employment discrimination under the ADA. Defendant's motion for summary judgment as to all claims is GRANTED.

ENTER:

James B. Zagel
United States District Judge

DATE: September 14, 2011